# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| JB Carter Enterprises, LLC dba ATM Merchant Systems,<br><br>    Plaintiff<br><br>v.<br><br>Elavon, Inc.,<br><br>    Defendant | Case No.: 2:18-cv-00394-JAD-NJK<br><br>**Order Granting Defendant's Motion for Summary Judgment, Denying Plaintiff's Motion for Partial Summary Judgment, Granting Motions to Seal, and Closing this Case**<br><br>[ECF Nos. 58, 59, 62, 64, 75] |

In response to large-scale data breaches and increased counterfeiting, the debit- and credit-card industry adopted a technology called EMV to authenticate chip-card transactions. Plaintiff JB Carter Enterprises, LLC dba ATM Merchant Systems (ATMMS) purchased Equinox L5200 terminals from its payment processor, defendant Elavon, Inc., in preparation for the shift. Elavon promised that these terminals were EMV-ready, but they were unable to support PIN-debit EMV transactions by the time liability for disputed transactions shifted from card-issuers to merchants.

ATMMS sues for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, negligent misrepresentation, international interference with business relations, and intentional interference with contractual relations. The parties filed cross-motions for summary judgment, and Elavon filed motions to seal proprietary business information in the briefing. Because the so-called Master Agreement between ATMMS and Elavon bars the alleged oral agreement to be EMV-compliant by the deadline, I grant summary judgment in favor of Elavon on ATMMS's contract-related claims. I also grant summary judgment in favor

of Elavon on ATMMS's other claims because there is no genuine issue of fact as to elements of each of these claims. And I grant Elavon's motions to seal.

## Background

In April 2011, ATMMS entered into a "Member Service Provider Sales and Service Agreement"—referred to by the parties as the "Master Agreement"—with Elavon.[1] Michael Poggi, ATMMS's general manager, testified that the purpose of the agreement was for Elavon and ATMMS to perform debit- and credit-card processing services together.[2] Under the Master Agreement, ATMMS agreed to market "Merchant Services," which are defined as "[p]ayment device processing services."[3] In turn, "[p]ayment [d]evice" is defined as "any device or method used for the purpose of obtaining credit or debiting a designated account, including a [c]redit [c]ard, [d]ebit [c]ard, and any other financial transaction device or method . . . that is now or hereafter utilized to effect [t]ransactions."[4] Schedule C to the agreement includes equipment pricing, including for the Equinox L5200 terminals at issue in this case.[5]

The Master Agreement limits liability with a monetary cap on damages and a prohibition of consequential damages.[6] The agreement's integration clause provides that the "agreement represents the entire understanding among [ATMMS], Elavon, and [U.S. Bank National Association] with respect to the matters contained herein and, except as provided in this Agreement, it may be amended only by an instrument in writing signed by each of the parties

---

[1] ECF No. 63 at 5.
[2] ECF No. 60 at 8–9.
[3] ECF No. 63 at 6–7.
[4] *Id.* at 7.
[5] *Id.* at 20.
[6] *Id.* at 13.

hereto."[7] And the choice-of-law-provision requires that the agreement be "governed by and construed in accordance with the laws of the State of Georgia."[8]

In 2012, credit- and debit- card issuers announced that that they would migrate to a new technology called EMV (Europay, Mastercard, Visa).[9] The technology uses cards embedded with computer chips in order to enhance fraud protection.[10] As part of the transition to EMV, liability for disputed transactions (chargebacks) shifted on October 1, 2015, from the card's issuing bank to merchants, if the merchant was unable to process EMV transactions.[11]

Elavon told ATMMS to purchase Equinox L5200 terminals, promising that they would be EMV-compliant and EMV-enabled.[12] And Elavon made numerous representations that it, and the Equinox L5200 terminal, would be EMV-ready by the crucial shift in liability.[13] Elavon purchased 197 terminals in reliance on these representations.[14]

Elavon knew that ATMMS had casino clients that relied on receiving cash back via credit services.[15] Elavon also knew that PIN-debit transactions were "crucial to the application that ATMMS has in the casinos."[16] But throughout 2014 and 2015, Elavon representatives communicated multiple delays in making the Equinox L5200 terminals ready for EMV

---

[7] *Id.* at 17.
[8] *Id.*
[9] ECF No. 64-2 at 20.
[10] *Id.* at 11.
[11] *Id.* at 5–6.
[12] ECF No. 64-2 at 10.
[13] ECF No. 64-4 at 4, 10–20.
[14] ECF No. 64-2 at 26; ECF No. 64-4 at 38.
[15] ECF No. 64-3 at 14; ECF No. 64-1 at 10.
[16] ECF No. 64-3 at 28.

transactions, culminating in an announcement that the terminals would never be EMV-capable.[17] Elavon's 30(b)(6) witness described the continual delays as "moving-target development," explaining that "when we would give dates, those are target dates; and then based on development and priority, those target dates would shift and then we would communicate that back to ATMMS."[18]

By the time of the liability shift, Elavon "could not process an EMV PIN-debit transaction" through the platform used by ATMMS.[19] Elavon sold ATMMS replacement Ingenico isc250 terminals at a discount,[20] but, at the time of the filing of these motions, those terminals could not process PIN-debit transactions through the platform used by ATMMS.[21] Elavon was aware that ATMMS was losing business due to the delays, and that ATMMS's ability to bid new business was impacted by the delays.[22]

## Discussion

### I. Cross-motions for summary judgment [ECF Nos. 59, 62, 64]

Elavon moves for summary judgment on all of ATMMS's claims.[23] ATMMS moves for partial summary judgment on its claims for fraud, negligent misrepresentation, intentional interference with contractual relations, and intentional interference with business relations.[24]

---

[17] ECF No. 64-4 at 20, 29–30, 35–38.
[18] ECF No. 64-2 at 9.
[19] ECF No. 64-1 at 70.
[20] ECF No. 70 at 135.
[21] *See* ECF No. 64-1 at 18.
[22] ECF No. 64-3 at 33.
[23] ECF No. 59 (redacted motion for summary judgment); ECF No. 62 (sealed motion for summary judgment).
[24] ECF No. 64.

4

### A. Summary-judgment standard

The principal purpose of the summary-judgment procedure is to isolate and dispose of factually unsupported claims or defenses.[25] The moving party bears the initial responsibility of presenting the basis for its motion and identifying the portions of the record or affidavits that demonstrate the absence of a genuine issue of material fact.[26] If the moving party satisfies its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show a genuine issue for trial.[27]

Who bears the burden of proof on the factual issue in question is critical. When the party moving for summary judgment would bear the burden of proof at trial (typically the plaintiff), "it must come forward with evidence [that] would entitle it to a directed verdict if the evidence went uncontroverted at trial."[28] Once the moving party establishes the absence of a genuine issue of fact on each issue material to its case, "the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense."[29] When instead the opposing party would have the burden of proof on a dispositive issue at trial, the moving party (typically the defendant) doesn't have to produce evidence to negate the opponent's claim; it merely has to point out the evidence that shows an absence of a genuine material factual

---

[25] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[26] *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

[27] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS 60 Minutes,* 67 F.3d 816, 819 (9th Cir. 1995).

[28] *C.A.R. Transp. Brokerage Co. v. Darden Rest.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992) (citation and quotations omitted)).

[29] *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (citation omitted).

issue.[30] The movant need only defeat one element of the claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[31] "When simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both motions before ruling on each of them."[32]

### B. Contract-related claims

Elavon argues that ATMMS's claims for breach of contract and breach of the implied convent of good faith and fair dealing fail because an alleged oral agreement to provide EMV-enabled terminals by October 1, 2015, was subject to the Master Agreement's integration clause and was not supported by consideration.[33] ATMMS responds that the Master Agreement did not contemplate the transition to EMV and that the oral agreement was supported by consideration.[34]

The Master Agreement includes a choice-of-law-provision designating Georgia law.[35] Under Georgia law, contract interpretation is a matter of law for the court.[36] Courts must first

---

[30] *See, e.g., Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990); *Celotex*, 477 U.S. at 323–24.

[31] *Celotex*, 477 U.S. at 322.

[32] *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)).

[33] ECF No. 62 at 10–16.

[34] ECF No. 71 at 8–9.

[35] ECF No. 63 at 17 ("This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, without regard to its conflict of law principles.").

[36] *Hall v. Ross*, 616 S.E.2d 145, 147 (Ga. Ct. App. 2005).

decide whether the language is clear and unambiguous.[37] "If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning."[38]

Elavon's 30(b)(6) representative testified that the Master Agreement did not contemplate EMV and did not address the transition to EMV,[39] but ATMMS's own witness admitted that the contract's purpose was "processing of credit card transactions, both the quasi-cash type -- all types."[40] And more importantly, the Master Agreement's terms encompass a broad array of financial processing. The crucial term, "[p]ayment [d]evice," is defined as "any device or method used for the purpose of obtaining credit or debiting a designated account, including a [c]redit [c]ard, [d]ebit [c]ard, and any other financial transaction device or method . . . that is now or hereafter utilized to effect [t]ransactions."[41] The inclusion of the term "hereafter" suggests that the Master Agreement was intended to encompass new forms of financial processing, like EMV. The agreement also included pricing for the Equinox L5200 terminals at issue in this litigation,[42] further suggesting that the agreement encompasses the subject matter of the alleged oral agreement.

Under the terms of the Master Agreement's integration clause, the contract represented the entire agreement between ATMMS and Elavon, and any subsequent amendments were required to be in writing.[43] So, any purported amendment to provide EMV-enabled terminals by

---

[37] *Id.*
[38] *Id.* (quoting *Woody's Steaks, LLC v. Pastoria*, 584 S.E.2d 41, 43 (Ga. Ct. App. 2003)).
[39] ECF No. 71-2 at 20, 31.
[40] ECF No. 77 at 47.
[41] ECF No. 63 at 7.
[42] *Id.* at 20.
[43] *Id.* at 17.

the October 1, 2015, transition date was required to be in writing. As no written amendment addressing the transition to EMV was executed, the master agreement bars the alleged oral agreement regarding the transition. I thus grant Elavon's motion for summary judgment on ATMMS's breach-of-contract claim.[44] And because ATMMS's breach-of-the-implied-covenant claim is based on the alleged oral contract that is barred under the Master Agreement's integration clause, I grant summary judgment in favor of Elavon on that claim as well.

### C. Fraud and negligent-misrepresentation claims

Elavon argues that ATMMS's fraud and negligent-misrepresentations claims fail because ATMMS has no evidence that Elavon knowingly made false representations or that Elavon failed to exercise reasonable care in communicating information to ATMMS.[45] Elavon also argues that the economic-loss doctrine bars ATMMS's negligent-misrepresentation claim.[46] ATMMS responds that the economic-loss doctrine does not apply and that it is entitled to summary judgment on the fraud and negligent-misrepresentation claims.[47]

#### 1. Elements of fraud and negligent misrepresentation

In Nevada, negligent misrepresentation and fraudulent misrepresentation both require proof that (1) the defendant supplied false information or made a false representation,[48] (2) the

---

[44] Because I grant summary judgment on this basis, I need not and do not address Elavon's other argument that the alleged oral agreement was unsupported by consideration.

[45] ECF No. 62 at 16–18.

[46] *Id.* at 18–19.

[47] ECF No. 71 at 9–18; ECF No. 64 at 17–20.

[48] The tort of negligent misrepresentation "requires an affirmative false statement; a mere omission will not do[,]" so alleged omissions can be pursued only under the theory of fraudulent misrepresentation. *See Republic Bank & Trust Co. v. Bear, Stearns & Co., Inc.*, 707 F. Supp. 2d 702, 713–14 (W.D. Ken. 2010) (applying Kentucky law, which, like Nevada, "follows the Restatement" for negligent misrepresentation).

plaintiff justifiably relied on the misrepresentation, and (3) damage to the plaintiff resulting from his reliance.[49] Negligent misrepresentation also requires proof that the defendant "failed to exercise reasonable care or competence in obtaining or communicating the information."[50] Fraudulent misrepresentation, on the other hand, also requires proof of the "[d]efendant's knowledge or belief that the representation is false (or had an insufficient basis for making the misrepresentation)" and "intention to induce plaintiff to act or refrain from acting in reliance upon the misrepresentation."[51]

Elavon points to its 30(b)(6) witness's testimony that the ultimately false representations regarding when it could process EMV transactions were a symptom of "moving-target development," thus showing an absence of evidence of a knowingly false misrepresentation.[52] ATMMS responds with evidence that decisions were made within Elavon impacting these moving targets, but the decisions would not be communicated to Elavon employees communicating to customers like ATMMS.[53] Although this evidence suggests a genuine issue of material fact with respect to Elavon's use of reasonable care in communicating target dates to ATMMS, it does not show that Elavon knowingly communicated false target dates to ATMMS. Because ATMMS does not respond with evidence of a genuine issue of material of fact on this

---

[49] *Compare Halcrow, Inc. v. Eighth Judicial Dist. Ct.*, 302 P.3d 1148, 1153 (Nev. 2013) (quoting Restatement (Second) of Torts § 552 for the elements of negligent misrepresentation), *with Bulbman, Inc. v. Nev. Bell*, 825 P.2d 588, 592 (Nev. 1992) (stating the elements of fraudulent misrepresentation).

[50] *Halcrow*, 302 P.3d at 1153.

[51] *Bulbman*, 825 P.2d at 592.

[52] ECF No. 62 at 17.

[53] ECF No. 71 at 11–13. ATMMS also points to deposition testimony by an Elavon witness that "[o]ur product was never striving to be ready for the EMV deadline." ECF No. 71-3 at 5. But this testimony refers to the platform ATMMS decided to use to integrate EMV into its system, *id.*, and ATMMS had the option to directly integrate to Elavon, *see* ECF No. 70 at 30.

necessary element, I grant summary judgment in favor of Elavon on ATMMS's fraudulent-misrepresentation claim and turn to ATMMS's negligent-misrepresentation claim.

### 2. Economic-loss doctrine

The "economic loss doctrine is a rule of judicial creation" under Nevada law that "marks the fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, which imposes a duty of reasonable care and thereby encourages citizens to avoid causing physical harm to others."[54] "[C]utting off tort liability at the point where only economic loss is at stake without accompanying physical injury or property damage provides incentives and disincentives to engage in economic activity or to make it safer."[55] "[T]he doctrine primarily functions to bar the recovery of purely monetary losses in certain . . . unintentional tort actions," including negligent misrepresentation.[56] "[E]xceptions to the doctrine apply in certain categories of cases when strong countervailing considerations weigh in favor of imposing liability,"[57] including actions against attorneys and "cases where there is significant risk that the law would not exert significant financial pressures to avoid such negligence."[58] In *Halcrow, Inc. v. Eighth Judicial District Court*¸ the Nevada Supreme Court applied the economic-loss doctrine to a negligent-misrepresentation claim because "contract law

---

[54] *Davis v. Beling*, 278 P.3d 501, 514 (Nev. 2012) (quotation omitted).

[55] *Terracon Consultants W., Inc. v. Mandalay Resort Grp.,* 206 P.3d 81, 88 (Nev. 2009) (quotation and alterations omitted).

[56] *Id.*; *Halcrow*, 302 P.3d at 1154. ATMMS argues that *Halcrow* is limited to claims against design professionals, but *Terracon* recognizes that the doctrine could apply to negligent-misrepresentation claims against others. *Cf. Terracon*, 206 P.3d at 87 (recognizing that courts have carved out exceptions to the economic-loss doctrine in negligent-misrepresentation cases against attorneys, accountants, and others).

[57] *Terracon,* 206 P.3d at 86.

[58] *Halcrow*, 302 P.3d at 1153 (quotation omitted).

10

is better suited" to resolve such claims in the context of commercial construction projects, where contracts "delineate[] each party's risks and liabilities."[59]

In deposition, ATMMS's representative identified only economic damages for processing fees, the cost of the terminals, and future business losses.[60] So, Elavon shows an absence of evidence of non-economic damages and ATMMS is required to "produce evidence of a genuine dispute of material fact that could satisfy its burden at trial."[61] Although ATMMS identified "damage to its business reputation" in its Rule 26(a) disclosures, it provides no evidence of these non-economic damages.

ATMMS argues that an exception to the economic-loss doctrine should apply here. But, as in *Halcrow*, contract law is better suited to resolve disputes in this context. The economic-loss doctrine serves to incentivize parties to make economic activity safer in cases like this one, where a written amendment to the Master Agreement would have clarified the parties' obligations and expectations for the transition to EMV processing. Had the parties done so, the contract would have "exert[ed] significant financial pressures to avoid . . . negligence."[62] Because the economic-loss doctrine bars ATMMS's negligent-misrepresentation claim, I grant summary judgment in favor of Elavon on that claim.

### D. Intentional-interference-with-contractual- and prospective-business-relations claims

Elavon argues that ATMMS's intentional-interference claims must fail because there is no evidence that Elavon intended to disrupt an existing contract or intended to harm ATMMS by

---

[59] *Id.*

[60] ECF No. 60 at 36.

[61] *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018).

[62] *Halcrow*, 302 P.3d at 1153 (quotation omitted).

preventing a specific prospective business relationship.[63]  ATMMS responds that Elavon knew of its existing and prospective relationships with casino clients that relied on PIN-debit transactions and that Elavon's decision to delay EMV PIN-debit processing was intentional conduct designed to harm ATMMS, entitling ATMMS to summary judgment on these claims.[64]

Under Nevada law, a claim for intentional interference with contractual relations requires proof of "(1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage."[65]  "[M]ere knowledge of [a contract between the plaintiff and a third-party] is insufficient to establish that the defendant intended or designed to disrupt the plaintiff's contractual relationship; instead, the plaintiff must demonstrate that the defendant intended to induce the other party to breach the contract with the plaintiff."[66]  Additionally, a claim for interference with prospective business relations under Nevada law requires proof of (1) a prospective contractual relationship between the plaintiff and a third party; (2) the defendant's knowledge of the prospective relationship; (3) the defendant's intent to harm the plaintiff by preventing the relationship; (4) the defendant's conduct was not privileged or justified; and (5) the plaintiff's actual harm as a result.[67]

ATMMS provides evidence of Elavon's knowledge of contractual and prospective business relationships with casino clients reliant on PIN-debit transactions,[68] but it fails to

---

[63] ECF No. 62 at 19–21.

[64] ECF No. 71 at 18–20; ECF No. 64 at 20–21.

[65] *J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003) (quoting *Sutherland v. Gross*, 772 P.2d 1287, 1290 (Nev. 1989)).

[66] *Id.* at 1268.

[67] *In re Amerco Deriv. Litig.*, 252 P.3d 681, 702 (Nev. 2011) (en banc).

[68] *See, e.g.*, ECF No. 64-3 at 28, 33.

12

identify any evidence that Elavon delayed PIN-debit functionality with the intent of disrupting ATMMS's contractual relationships with those casino clients or harming ATMMS by preventing prospective business relations. Rather, the evidence identified by ATMMS and Elavon shows that the PIN-debit delay resulted from shifting development priorities and the platform chosen by ATMMS to integrate the new technology.[69] ATMMS essentially asks me to infer intent from Elavon's knowledge of ATMMS's relationships with casino clients and the unique impact of the PIN-debit delay on these clients,[70] but I will not make that inference when the evidence compels a different conclusion as to Elavon's intent. I thus grant summary judgment in favor of Elavon on ATMMS's intentional-interference claims, leaving no claims remaining.

## II. Motions to seal [ECF Nos. 58, 75]

Elavon moves to seal the Master Agreement, which was attached as Exhibit A to Elavon's summary judgment motion.[71] Elavon also moves to redact portions of its motion for summary judgment and reply brief in support of that motion that refer to the agreements.[72] ATMMS does not oppose the motions.

"The public has a 'general right to inspect and copy public records and documents including judicial records and documents.'"[73] "Although the common law right of access is not absolute, '[courts] start with a strong presumption in favor of access to court records.'"[74] "A

---

[69] ECF No. 64-2 at 9; ECF No. 70 at 34–36.

[70] ECF No. 71 at 19–20.

[71] ECF No. 58.

[72] ECF Nos. 58, 75.

[73] *In re Midland Nat. Life Ins. Co. Annuity Sales Practices Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012) (quoting *Nixon v. Warner Commc'ns., Inc.*, 435 U.S. 589, 597 (1978)).

[74] *Id.* at 1119 (quoting *Foltz v. St. Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)).

13

party seeking to seal judicial records can overcome the strong presumption of access by providing 'sufficiently compelling reasons' that override the public policies favoring disclosure."[75] "When ruling on a motion to seal court records, the district court must balance the competing interests of the public and the party seeking to seal judicial records."[76] "To seal the records, the district court must articulate a factual basis for each compelling reason to seal[,] [which] must continue to exist to keep judicial records sealed."[77]

Having reviewed the Master Agreement, sealed motion, and sealed reply brief in camera, I conclude that there are compelling reasons to seal these dispositive-motion exhibits in their entirety and redact the portions of the motion and reply brief quoting or paraphrasing the exhibits. The Master Agreement specifically provides that its terms are confidential and proprietary.[78] The exhibit and the redacted portions of the motion and reply brief thus contain confidential business information. Public disclosure of the information contained in these exhibits could potentially damage the parties, and I find that compelling reasons exist to seal this information. Accordingly, I grant Elavon's motions to seal.

**Conclusion**

Accordingly, **IT IS HEREBY ORDERED** that Elavon's motions to seal **[ECF No. 58, 75]** are **GRANTED**. The Clerk of Court is directed to maintain ECF Nos. 62, 63, and 77 under seal.

**IT IS FURTHER ORDERED** that Elavon's motion for summary judgment **[ECF Nos. 59, 62] is GRANTED** and ATMMS's motion for partial summary judgment **[ECF No. 64] is**

---

[75] *Id.* (quoting *Foltz*, 331 F.3d at 1135).
[76] *Id.* (citing *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006)).
[77] *Id.* (citing *Kamakana*, 447 F.3d at 1179; *Foltz*, 331 F.3d at 1136).
[78] ECF No. 63 at 16.

14

**DENIED.** I grant summary judgement in favor of Elavon and against ATMMS. The Clerk of Court is directed to **ENTER FINAL JUDGMENT ACCORDINGLY** and **CLOSE THIS CASE**.

Dated: January 21, 2020

_____
U.S. District Judge Jennifer A. Dorsey