# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JB Carter Enterprises, LLC dba ATM
Merchant Systems,

      Plaintiff

v.

Elavon, Inc.,

      Defendant

Case No.: 2:18-cv-00394-JAD-NJK

**Order on Remand**

In response to large-scale data breaches and increased counterfeiting, the debit- and credit-card industry adopted a technology known as "EMV" in 2015 to authenticate chip-card transactions. Before this industry shift, plaintiff JB Carter Enterprises, LLC dba ATM Merchant Systems (ATMMS), which provides account services like credit-card, ATM, and check-cashing transactions to merchants, retained defendant Elavon, Inc. as its payment processor and linked its software to Elavon's systems. While Elavon represented that its systems would be ready for the EMV transition, years later they still weren't, so ATMMS sued Elavon for damages.

Though ATMMS's case was disposed of on summary judgment in 2020,[1] most of its claims were revived on appeal to the Ninth Circuit.[2] Those claims proceeded to a bench trial in December 2022. ATMMS prevailed on its negligent-misrepresentation claim only, and I awarded nominal damages of just $1 because, "while ATMMS proved that Elavon caused it some harm, [I wa]s left without sufficient evidence to put a dollar figure on that harm."[3]

---

[1] ECF No. 78.

[2] ECF No. 108.

[3] ECF No. 155 at 48.

ATMMS took back some ground on its appeal from that judgment. In a 2025 memorandum disposition, the Ninth Circuit panel found that this court "clearly erred in concluding" that ATMMS did not prove that "Elavon acted with the requisite intent" to establish its fraud claim.[4] On ATMMS's claims for intentional interference with existing and prospective contractual relations, the panel found that this court clearly erred in finding that ATMMS did not prove that Elavon intentionally acted to disrupt a contractual relationship. "Because the district court did not address the other elements of intentional interference," it remanded those claims "for further consideration."[5] The panel expressly affirmed this court's nominal-damages award of $1 and the conclusion that ATMMS didn't prove an amount of actual damages.[6] But because the panel found that ATMMS had proven its fraud claim, it remanded for this court to "consider whether punitive damages are available under Nevada law in the first instance in light of [that] decision."[7]

Having reexamined the trial record on remand through the lens of the Ninth Circuit's memorandum disposition, I conclude that ATMMS has proven the remaining elements of its intentional-interference-with-existing-contracts claim, but not its prospective-contract claim. That win does not affect my damages determination, however, which was affirmed on appeal. So the damages awarded for that claim are nominal damages of $1 only.

Neither does the reversal of my fraud ruling merit recalculation of the compensatory damages in this case. But the panel's determination that ATMMS proved that Elavon had the intent to defraud ATMMS, coupled with various other aspects of that holding, entitle ATMMS to

---

[4] ECF No. 173 at 3.

[5] *Id*. at 5–6.

[6] *Id*. at 7.

[7] *Id.* at 8.

an award of punitive damages.  Because Nevada's punitive-damages statute requires a separate

proceeding "to determine the amount of such damages to be assessed," I set a briefing schedule

and direct the parties to address the amount of punitive damages to be awarded, which I find is

subject to a $300,000 statutory cap and constitutional limitations.

**Discussion**

**A.    ATMMS proved the remaining elements of its claim that Elavon intentionally interfered with existing contracts, but not its prospective-contract claim.**

The first issue that the Ninth Circuit's 2025 memorandum disposition remanded "for

further consideration" is whether ATMMS proved the remaining elements of its claims for

intentional interference with contractual relations and prospective business relations.[8]  The claim

for interference with contractual relations requires proof of (1) a valid and existing contract;

(2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt

the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage.[9]  The

prospective-business-relations claim, too, has five elements: (1) a prospective contractual

relationship between the plaintiff and a third party; (2) knowledge by the defendant of the

prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the

absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a

---

[8] ATMMS baldly argues that this court must "tak[e] evidence at a hearing" in order to carry out the Ninth Circuit's remand of these intentional-interference claims.  ECF No. 181 at 18.  But nothing in the memorandum disposition supports that position.  The panel took issue only with this court's appraisal of the evidence presented at the bench trial; it did not find error in any evidentiary ruling that would necessitate giving ATMMS another opportunity to present new evidence on these claims.  *See generally* ECF No. 173.  ATMMS tried the intentional-interference case it wanted to try.  All this court must do on remand is determine whether the evidence ATMMS chose to present satisfied "the other elements of intentional interference."  *Id.* at 6.

[9] *J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003).

3

result of the defendant's conduct.[10]  Because the Ninth Circuit found that ATMMS proved the intent element—the third element in each claim—the remaining four from each claim now must be evaluated.

The evidence at trial established these four elements for ATMMS's claim that Elavon intentionally interfered with existing contracts.  ATMMS's CEO, Bartus Carter, III, testified that the company had and lost "customers as a result of not being EMV ready on October 1 of '15,"—"mainly our larger customers, casinos."[11]  It was also established that Elavon was aware of ATMMS's casino-customer relationships as Robert Morris—a relationship manager at Elavon during the relevant time period—testified that Elavon knew that ATMMS had the niche market of casino clients for whom EMV readiness was "important."[12]  Morris further elaborated that "Elavon kn[e]w of ATMMS's clients" because Elavon "would have reporting that [it] could access that would show [it] all of the relationships" ATMMS had signed up to Elavon's platform.[13]  And he conceded that the lack of EMV readiness by the deadline "would impact" ATMMS's business "greatly" because their casino customers "demanded it."[14]  As the Ninth Circuit summarized in its 2025 memorandum disposition, "the record shows that Elavon knew of (1) ATMMS's business structure and clientele, (2) the likely impacts of failing to provide EMV capabilities by the liability-shift deadline, and (3) that around October 2015 ATMMS's clients

---

[10] *In re Amerco Derivative Litig.*, 252 P.3d 681, 702 (Nev. 2011).

[11] ECF No. 136 at 39:16–20; 40:10–16.

[12] Deposition of Robert Morris (ECF No. 153) at 25:6–25.  The page numbers in deposition cites in this order refer to the original deposition-transcript pages, not the ECF document page numbers.  To the extent that any of these excerpts I cite herein drew an objection, *see* ECF No. 141, those objections are overruled.

[13] *Id*. (ECF No. 153) at 39:7–14.

[14] *Id*. at 40:14–50:10.

were breaching or not renewing their contracts because they were no longer shielded from liability."[15]  Carter testified that this "failure to provide" ATMMS "with EMV" caused it to lose its larger customers, which then had cascading impacts on its business.[16]  So I find that ATMMS established all of the elements of its claim that Elavon intentionally interfered with its existing contracts.

The same cannot be said of ATMMS's claim for intentional interference with prospective contracts, however.  The Ninth Circuit's summary of the trial record contains no mention of evidence of *prospective* contracts or clients.[17]  The only record citations that ATMMS offers about prospective business are to the deposition testimony of Robert Morris.[18]  But on this point, Morris's testimony was entirely speculative:

> Q. Did [Mike Poggi] tell you how much business he lost?
>
> A. Not that I remember specifics on.  No.
>
> Q. What about his ability to bid new business?  Did it impact that?
>
> A. I mean, in my mind, it would.  I don't recall specifics about him telling me he was losing opportunities with new business, but it would make sense that he was.[19]

To be sure—and as my review of the evidence has confirmed—there was some generalized testimony about lost prospective business.  Poggi testified that ATMMS's growth stopped in 2015 "prior to the shift because" it couldn't provide evidence that it would be EMV-compliant "come the shift date," and it "couldn't bid new business because, in those requests for

---

[15] ECF No. 173 at 6.

[16] ECF No. 136 at 40:10–16; 41:16–42:19.

[17] *See* ECF No. 173 at 6.

[18] *See* ECF No. 181 at 18–19; ECF No. 185 at 7–8.

[19] Morris depo. (ECF No. 153) at 52–53.

pricing or quotes, they required [ATMMS] to commit that [it] would be EMV" ready.[20]  And

Elavon's Lisa Brooks Carmichael acknowledged that Poggi told her that he "couldn't go get new

business."[21]  But ATMMS did not introduce any of those requests for pricing or prospective

contracts as documentary evidence at trial, and the record is devoid of any specific details about

any contract or relationship that would allow me to match up such business with Elavon's

knowledge of it.  And Brooks Carmichael also testified that Elavon never became "aware of the

identity of any new gaming location customers that ATMMS was pursuing during this time

period" and was "never brought into any conversations.  That was never shared with us," she

said.[22]  On this record, I cannot find that ATMMS proved by a preponderance of the evidence

the first two elements needed for this claim—the existence of prospective contractual

relationships between ATMMS and a third party and that Elavon knew of such relationships.[23]

**B.    The insufficiency of ATMMS's damages proof plagues its intentional-interference recovery.**

Unfortunately for ATMMS, its remand victory on the contractual-interference claim

doesn't entitle it to an award of actual damages.  ATMMS's damages case at trial was singular—

it offered the same damages theory for all claims or, as the Ninth Circuit put it, "ATMMS sought

the same compensatory damages for each of its claims, as well as punitive damages on its

intentional-tort claims."[24]  Because I previously found that ATMMS proved its negligent-

---

[20] ECF No. 140 at 129–30.

[21] *Id*. at 39:17–23.

[22] ECF No. 137 at 152–53.

[23] Even if I were to conclude that the record supports these two additional elements, the paucity of the damages evidence prevents ATMMS from recovering anything more than the very same nominal damages for this claim.  *See infra* at pp. 6–7.

[24] ECF No. 173 at 6.

misrepresentation claim, I "analyzed whether ATMMS was entitled to damages."[25]  After

evaluating the nature and quantity of ATMMS's damages evidence, I concluded that ATMMS

failed to satisfy its burden at trial to provide "an evidentiary basis for determining a reasonably

accurate amount of damages."[26]  So I awarded ATMMS nominal damages of $1 only.[27]  The

Ninth Circuit affirmed that assessment.[28]  The concluding paragraph of the memorandum

disposition states, "the judgment of the district court is **AFFIRMED IN PART** as to ATMMS's

. . . actual and reputational damages. . . ."[29]

Having reviewed the record in light of the remand order and my new findings on the

intentional-interference claims, I find no basis to retreat from my previous damages assessment.

Regardless, my authority to do so is limited by the rule of mandate.[30]  So although ATMMS's

intentional-interference-with-existing-contracts claim has slid over into the "win" column, the

insufficiency of its damages proof at trial means that ATMMS recovers only nominal damages

for that claim, too.

**C.    ATMMS is not entitled to a recalculation of actual damages for its fraud claim.**

In my bench ruling, I found that ATMMS did not prove any of its three fraud theories,

but the Ninth Circuit reversed on one—the theory that Elavon did not provide EMV capabilities

by the liability-shift deadline.[31]  The panel reasoned that "testimony from Elavon's witnesses

---

[25] *Id*.

[26] ECF No. 155 at 44 (quoting *Mort Wallin of Lake Tahoe, Inc. v. Com. Cabinet Co.*, 784 P.2d 954, 955 (Nev. 1989)).

[27] *Id*. at 48.

[28] ECF No. 173 at 7.

[29] *Id*. at 9.

[30] *See infra* at pp. 10–11.

[31] ECF No. 173 at 2–3 & n.1.  The Ninth Circuit panel made it clear in three separate footnotes that this was the only theory that survived the appeal.  *See id*. at nn. 1, 2 & 3.  So at this post-

plainly indicated that Elavon made the representations at issue to keep ATMMS as a client—that is, by inducing ATMMS's reliance on Elavon's representations regarding certain target dates. The district court clearly erred in concluding otherwise."[32]  Because it held that ATMMS "proved at least one intentional tort—fraud," the panel also instructed that "[o]n remand, the district court should consider whether punitive damages are available under Nevada law in the first instance in light of our decision."[33]  It added that, "[i]n evaluating the amount of appropriate punitive damages, if any, the district court must consider both the limits imposed by Nevada law, and by the Due Process Clause of the Fourteenth Amendment."[34]

Although the panel issued no instruction about actual or compensatory damages for the fraud claim, ATMMS argues that this court "must revisit and recalculate Plaintiff's fraud damages."[35]  What's more, ATMMS says that it should "be allowed to present evidence of its fraud damages" and that "this Court must take evidence of Plaintiff's fraud damages."[36]  The reason, it suggests, is that "[h]ad this Court properly found the requisite intent to support Plaintiff's fraud claim, it's likely this Court would have viewed Plaintiff's evidence through a different lens."[37]

---

appeal stage of the proceedings, the theories "that Elavon did not provide EMV PIN debit capabilities by the liability-shift deadline" and "that Elavon failed to deliver EMV-complaint L5200 terminals" are no longer at issue.  *See id.* at n.1.

[32] *Id.* at 3.

[33] *Id.* at 8–9.

[34] *Id.* at n.5 (internal citations omitted).

[35] ECF No. 181 at 15.

[36] *Id.*

[37] *Id.*

1    There are several problems with this logic. First, no error in this court's assessment of

2    ATMMS's fraud claim justifies giving it the chance to present new evidence. This court made

3    no evidentiary decisions that impacted the quantity or nature of the evidence that ATMMS got to

4    present, and the Ninth Circuit did not find any errors in the court's gatekeeping. ATMMS had a

5    full opportunity to—and did—put on the case of its choosing at the time of trial. And it offers no

6    authority for the notion that it should be given a second damages phase to cure the deficiencies

7    that it alone was responsible for.

8    The second flaw in ATMMS's logic is its belief that my actual-damages ruling was

9    somehow impacted by my erroneous take on Elavon's fraudulent intent. In truth and fact, these

10   issues are wholly separate. I found that ATMMS's proof of actual damages did not meet the

11   substantial-evidence standard because its testimonial damages figures were "unsupported" and

12   nothing "more than speculation," and that "[t]he record is devoid of evidence to address"

13   significant gaps in the spreadsheet that was the lone piece of documentary evidence of damages

14   introduced at trial.[38] As the Ninth Circuit summarized, I "concluded that ATMMS's evidence

15   regarding the amount of its actual damages was speculation, from which [I] could not make a

16   reasonably accurate damages calculation. . . ."[39] The fatal insufficiency of that actual-damages

17   proof remains the same regardless of how strongly I view the evidence of Elavon's fraudulent

18   intent, and ATMMS has not demonstrated otherwise.

19   Finally, revisiting the actual-damages calculation would violate the rule of mandate. It is

20   well established that "district courts are not free to decide issues on remand that were previously

21

22

---

23   [38] ECF No. 155 at 45–48.

[39] ECF No. 173 at 7.

9

decided either expressly or by necessary implication on appeal."[40]  So when a case has been

decided on appeal and remanded to the district court, the issues "disposed of by" the appellate

court's ruling are "considered as finally settled.  The district court is bound by the decree as the

law of the case and must carry it into execution according to the mandate."[41]  In short, "[m]atters

that were adjudicated on the first appeal are no longer open to re-examination."[42]

      The accuracy of this court's damages calculation (other than punitive damages, which I

get to below) was adjudicated in ATMMS's appeal from my bench-trial decision.  ATMMS

challenged my ruling that it had not proven damages with reasonable accuracy and was thus

entitled only to nominal damages.  After scrutinizing and summarizing the bases for that ruling,

the Ninth Circuit panel held that it "was not clear error."[43]  And it found that ATMMS had

"forfeited" its challenge of my refusal to award reputational damages "because ATMMS did not

explain its argument or cite any supporting authorities."[44]  The panel then expressly

"**AFFIRMED IN PART** as to . . . actual and reputational damages. . . ."[45]  So my compensatory

---

[40] *Mirchandani v. United States*, 836 F.2d 1223, 1225 (9th Cir. 1988).

[41] *United States v. Thrasher*, 483 F.3d 977, 981 (9th Cir. 2007) (quoting *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255–56 (1895)) (cleaned up); *see also Stevens v. F/V Bonnie Doon*, 731 F.2d 1433, 1435 (9th Cir. 1984) (explaining that "[t]he mandate is controlling as to all matters within its compass").

[42] *Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 966 (9th Cir. 2005) (quoting *Coleman Co. v. Holly Mfg. Co.*, 269 F.2d 660, 664 (9th Cir. 1959)).

[43] ECF No. 173 at 7.

[44] *Id*.

[45] *Id*. at 9.

1  damages determination is "considered as finally settled" under the rule of mandate,[46] and this

2  court lacks the jurisdiction to revisit it.[47]

3  **D.    ATMMS is entitled to an award of punitive damages for Elavon's fraud, and the court will conduct further proceedings to determine the amount, subject to the $300,000 statutory cap and constitutional limitations.**

5       Section 42.005(1) of the Nevada Revised Statutes (NRS) authorizes an award of punitive

6  damages in a tort case in which "it is proven by clear and convincing evidence that the defendant

7  has been guilty of oppression, fraud, or malice, express or implied . . . ."[48]  Because my bench-

8  trial ruling did not result in ATMMS prevailing on any intentional tort, I "held that punitive

9  damages were unavailable."[49]

10      Implied in the Ninth Circuit panel's determination that ATMMS proved its fraud claim,

11  however, is that ATMMS proved "by clear and convincing evidence that" Elavon "has been

12  guilty of . . . fraud,"[50] triggering this court's "discretion to determine whether the defendant's

13  conduct merits punitive damages as a matter of law."[51]  Thus, the panel reversed my punitive-

14  damages ruling and remanded for me to "consider whether punitive damages are available under

---

[46] *Thrasher*, 483 F.3d at 981 (quoting *In re Sanford Fork & Tool Co.*, 160 U.S. at 255).

[47] *Hall v. City of L. A.*, 697 F.3d 1059, 1067 (9th Cir. 2012) ("Violation of the rule of mandate is a jurisdictional error.").

[48] Nev. Rev. Stat. § 42.005(1) (cleaned up).

[49] ECF No. 173 at 8.

[50] *See Nev. State Educ. Ass'n v. Clark Cnty. Educ. Ass'n*, 482 P.3d 665, 675 (Nev. 2021) (noting that "to prevail on a fraud claim, a plaintiff must prove five elements by clear and convincing evidence").

[51] *Bongiovi v. Sullivan*, 138 P.3d 433, 450–51 (Nev. 2006) ("A plaintiff is not automatically entitled to punitive damages.  Instead, punitive damages may be awarded when the plaintiff proves by clear and convincing evidence that the defendant is 'guilty of . . . fraud . . . .'"); *see also Evans v. Dean Witter Reynolds, Inc.*, 5 P.3d 1043, 1052 (Nev. 2000) ("the allowance or denial of exemplary or punitive damages rests entirely in the discretion of the trier of fact"). NRS 42.005(1) is permissive, as it states that the plaintiff "may recover" punitive damages. *See* Nev. Rev. Stat. § 42.005(1).

1  Nevada law in the first instance in light of [the panel's] decision."[52]  As the panel noted, this

2  requires me to determine on remand (1) whether Nevada law authorizes an award of punitive

3  damages when only nominal damages are awarded; and (2) the amount of appropriate punitive

4  damages, if any, . . . consider[ing] both the limits imposed by Nevada law, *see* Nev. Rev. Stat.

5  § 42.005(1)(b), and by the Due Process Clause of the Fourteenth Amendment."[53]

6

7  ### 1.    *The absence of an award of compensatory damages does not preclude an award of punitive damages.*

8  The question of whether punitive damages are available in Nevada when the plaintiff has

9  proven only nominal damages arises because NRS 42.005(1) expressly states that punitive

10  damages may be awarded "in addition to the compensatory damages," and the Nevada Supreme

11  Court has repeatedly said that "punitive damages cannot be awarded unless compensatory

12  damages are also awarded . . . ."[54]  The statute doesn't mention nominal damages, and the Ninth

13  Circuit has many times differentiated nominal from compensatory damages.  For example, in

14  *Schneider v. County of San Diego*, the panel provided this detailed distinction:

15  
16  > Compensatory damages and nominal damages serve distinct purposes.  Nominal damages are a purely "symbolic vindication of a constitutional right," and are awarded regardless of whether "the constitutional violation causes any actual damage."  Compensatory
17  > damages, by contrast, serve to return the plaintiff to the position he or she would have occupied had the harm not occurred.  Indeed,

18

19

20  ---

[52] ECF No. 173 at 8–9.

21  [53] *Id*. at 8 & n.5 (citing Nev. Rev. Stat. § 42.005(1)(b) and *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419–29 (2003)).

22  [54] *Evans*, 5 P.3d at 1054; *see also Sprouse v. Wentz*, 781 P.2d 1136, 1138–39 (Nev. 1989)

23  ("Also, compensatory damages must be awarded before the court can award punitive damages."); *City of Reno v. Silver State Flying Serv., Inc*., 438 P.2d 257, 264 (Nev. 1968) ("Punitive damages cannot be awarded by a jury unless it first finds compensatory damages.").

nominal damages are normally awarded when a plaintiff is unable
to demonstrate an entitlement to compensatory damages.[55]

But in its memorandum disposition here, the Ninth Circuit panel noted that "some states interpreting nearly identical" punitive-damages statutes—specifically California—have found nominal damages a sufficient predicate to an award of exemplary damages.[56]  Indeed, California Civil Code § 3294(a) is identical to NRS 42.001(a) except for swapping the phrase "compensatory damages" for "actual damages."[57]  And "California permits the award of punitive damages where a plaintiff receives only nominal damages, provided the plaintiff has proven actual, but unquantifiable, damages."[58]  That is precisely what happened here.  I found that "[w]hile ATMMS proved that Elavon caused it some harm, [I wa]s left without sufficient

---

[55] *Schneider v. Cnty. of San Diego*, 285 F.3d 784, 795 (9th Cir. 2002) (quoting *George v. Long Beach*, 973 F.2d 706, 708 (9th Cir. 1992), and citing Dan B. Dobbs, Remedies § 1.1 (2d ed. 1993); *Carey v. Piphus*, 435 U.S. 247, 255 (1978)); *see also Platt v. Moore*, 15 F.4th 895, 904 (9th Cir. 2021) (quoting *Schneider* and explaining that "[n]ominal damages claims of one dollar have consistently been understood as categorically different from even small compensatory damages claims, as 'compensatory damages and nominal damages serve distinct purposes'"); *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 872 (9th Cir. 2017) (recognizing that "nominal damages are divorced from any compensatory purpose"); *Cummings v. Connell*, 402 F.3d 936, 945 (9th Cir. 2005) (distinguishing nominal damages from compensatory damages and noting that "[r]ecovery of nominal damages is important not for the amount of the award, but for the fact of the award.  Indeed, nominal damages do not measure anything.").

[56] ECF No. 173 at 8 (citing *California v. Altus Fin. S.A.*, 540 F.3d 992, 1000 (9th Cir. 2008) (interpreting Cal. Civ. Code § 3294(a))).

[57] *Compare* Cal. Civ. Code § 3294(a) ("In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant"), *with* Nev. Rev. Stat. 42.005(1).

[58] *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1102 (N.D. Cal. 2007) (citing *Kizer v. Cnty. of San Mateo*, 806 P.2d 1353, 1357 (Cal. 1991), as modified (Mar. 28, 1991), and overruled on other grounds by *Los Angeles Unified Sch. Dist. v. Superior Ct.*, 529 P.3d 1096 (Cal. 2023)).

1    evidence to put a dollar figure on that harm.  With no way to bridge that evidentiary gap, I

2    award[ed] ATMMS only nominal damages of $1."[59]

3    　　　Just a few months ago, the District of Oregon in *Great West Capital, LLC v. Payne*

4    considered the availability of punitive damages in a fraud case in which the jury awarded

5    punitive damages atop $1 in nominal damages and found that Nevada would recognize that

6    nominal damages are sufficient to unlock the ability to recover punitive damages under NRS

7    42.005.[60]  Citing to the Ninth Circuit panel's memorandum disposition in *ATMMS v. Elavon*, the

8    *Great West Capital* court conceded that "[i]t is unclear 'whether nominal damages are

9    considered compensatory under Nevada law.'"[61]  So it looked to California law, as Nevada

10   courts often do, particularly when interpreting nearly verbatim statutory provisions.[62]  And

11   because "California courts have long interpreted nominal damages as a form of compensatory

12   damages that may support an award of punitive damages under" California's nearly identical

13   statute, the Oregon court "presume[d that] the Nevada Supreme Court would follow the well-

14   established California law interpreting the statute and conclude[d] that an award of nominal

15   damages may justify an award of punitive damages in" that case.[63]

16   　　　I find the *Great West Capital* court's analysis persuasive and adopt it here.  Because I

17   awarded nominal damages of just $1 when ATMMS proved injury but wasn't able to quantify it

18   in a way that permitted me to calculate a compensatory-damages figure, it is not unreasonable to

19

20

---

21   [59] ECF No. 155 at 48; ECF No. 173 at 7, 9 (affirming this court's actual-damages determination).

     [60] *Great W. Cap., LLC v. Payne*, 2025 WL 2463216, at *5 (D. Or. Aug. 27, 2025).

22   [61] *Id*. at *5 (citing ECF No. 173 at 8).

23   [62] *Id*. (citing *Mort v. United States*, 86 F.3d 890, 893 (9th Cir. 1996)).

     [63] *Id.*

view those nominal damages as compensatory damages for purposes of NRS 42.005.[64]  Plus, "Elavon does not dispute that the Nevada Supreme Court may follow the same route [as California] and allow punitive damages based on nominal damages alone."[65]  So I find that the fact that ATMMS recovered only nominal damages for its injury does not preclude a punitive-damages award in this case, should one be merited.

### 2.    Any punitive-damages award is capped by NRS 42.005(1)(a)'s $300,000 limit.

Nevada's punitive-damages statute contains monetary caps.  It expressly states that such damages "may not exceed: (a) Three times the amount of compensatory damages awarded to the plaintiff if the amount of compensatory damages is $100,000 or more; or (b) Three hundred thousand dollars if the amount of compensatory damages awarded to the plaintiff is less than $100,000."[66]  The statute exempts certain types of actions from these limits.[67]  Because this court awarded damages of just $1, and if no exemption applies, subsection (b) caps any punitive-damages award in this case at $300,000.

### a.    The statute exempts actions against manufacturers, distributors, or sellers of defective products from its caps.

ATMMS takes the position that the exemption that provides that these limits "do not apply to an action brought against: (a) A manufacturer, distributor, or seller of a defective product" applies here.[68]  Elavon meets this definition, ATMMS argues, because Elavon supplied

---

[64] *See, e.g., Bains LLC v. Arco Prods. Co.*, 405 F.3d 764, 772 (9th Cir. 2005) ("An award of nominal damages does not mean that there were not actual economic damages, just that the exact amount of damages attributable to the improper conduct was not proven.").

[65] ECF 184 at 14.

[66] Nev. Rev. Stat. § 42.005(1).

[67] Nev. Rev. Stat. § 42.005(2).

[68] Nev. Rev. Stat. § 42.005(2)(a) (cleaned up).

to ATMMS software known as the "Commerce SDK" program, which was a *product*, and it was *defective* because "it did not meet ATMMS's EMV promised and required capabilities."[69] Elavon responds that the defective-product exemption applies only to product-liability actions,[70] which this case was not. And regardless, the crux of this action was not that Elavon manufactured, distributed, or sold a product but rather that "a product would be ready by a date certain and ultimately was not ready by that date certain."[71] So "[i]n this sense, there is no defective product even at issue with respect to ATMMS's fraud claim. Indeed, the crux of

---

[69] ECF No. 185 at 11.

[70] Although I don't reach the merits of this point because I find that ATMMS has not established that the product it points to was defective, *see infra* at 17–19, the legislative history of this defective-product exception indicates that this provision was intended to exempt product-liability claims specifically rather that product manufacturers generally. *See* Assembly Daily Journal, 65th Leg., at 31 (Nev., May 8, 1989) (comments of Committee Chairman and Assemblyman Sader) ("There are several exceptions finally in this bill: . . . product liability. . . . The committee felt in each case that there was compelling public interest and grounds not to include these types of actions in punitive damage caps."); Senate Daily Journal, 65th Leg., at 16 (Nev., May 24, 1989) (comments of Senator Neal) ("It is pointed out by the proponents that the cap on compensatory damages proposed by Assembly Bill No. 307 has exclusions to protect the people of this state. That is true in the area of product liability . . . ."); Senate Daily Journal, 65th Leg., at 19 (Nev., May 24, 1989) (comments of Senator Wagner) (quoting letter from the Legislative Counsel Bureau stating that "[t]he bill declares that there is no limit to punitive damage awards in actions arising from the liability for products. . . ."). And as both Senator Wagner and Assemblyman Sader stated, "[p]roducts liability is also a vital concern to our committee. . . . This, we believe, will encourage safe, well-designed products to be placed in the hands of Nevada consumers. We want to make certain in our state that a manufacturer will never make the economic decision to keep a defective product on the shelves rather than correct the problem and save many people from death or devastating injuries. Examples of these types of decisions include the Ford Pinto, Dalkon Shield and asbestos cases. We do not want the manufacturers of such products, used by Nevada citizens daily, to be able to make this economic decision." Assembly Daily Journal, 65th Leg., at 32 (Nev., May 8, 1989) (comments of Committee Chairman and Assemblyman Sader); Senate Daily Journal, 65th Leg., at 14 (Nev., May 24, 1989) (comments of Senator Wagner).

[71] ECF No. 184 at 15.

ATMMS's alleged harm was because it did not receive the product from Elavon.  The product did not exist and was not provided to ATMMS by the timeframe promised."[72]

### b.  *ATMMS has not established that Elavon's product was defective.*

While ATMMS's argument is clever, it is unsupported by the proven facts of this case. This was not a defective-product case, and Elavon is not in the products business.  As ATMMS itself explains in its "Statement of the Case" in its post-remand briefing, Elavon was its service provider for processing credit- and debit-card transactions:

> Elavon began serving as the processor for ATMMS's credit/debit card transactions.  In 2012, the credit/debit card industry announced a new technology called EMV (Europay Mastercard Visa) to authenticate credit/debit card transactions.  EMV uses computer chip embedded cards to prevent fraud.  On October 1, 2015, liability for disputed transactions shifted from the proc4essor (Elavon) to the merchant (ATMMS or its casino clients) for non-EMV transactions.  From 2012 through 2015, it is undisputed that Elavon made many false representations it would be ready for EMV by the deadline.  However, Elavon, in spite of constant representations to the contrary, was not fully ready for EMV by the liability shift deadline.  At all times, Elavon knew and understood that ATMMS's unique business with casino clients required an ability to get cash back via PIN debit transactions.  However, Elavon could not process EMV PIN debit transactions by the EMV deadline.

In an effort to provide the services promised, Elavon did provide ATMMS with certain technological tools, known as "Commerce SDK."  SDK is short for Software-Development Kit.[73]  And as ATMMS points out, Elavon's Vice President of Integrated Products, Eric Przybylek, who was "in charge of" Commerce SDK, acknowledged at his deposition that

---

[72] *Id.* (cleaned up).

[73] *See* Exhibit 39 (the Commerce SDK License Agreement).

1    "Commerce SDK is a product."[74]  So in this sense, Elavon was perhaps loosely a distributor or

2    supplier of a product.

3        But even assuming that ATMMS's broad interpretation of this exemption is right, I

4    cannot conclude that this product was defective.  The license agreement between Elavon and

5    ATMMS for Commerce SDK explains that a software-development kit "generally means a set of

6    software-development tools that allows the creation of applications for a certain software

7    package, software framework hardware platform, computer system, operating system, or similar

8    development platform."[75]  This one was "intended to," among other things, "assist a merchant in

9    implementing a pre-certified EMV and contactless payment solution" and also allow "a

10   developer to code to the Commerce SDK interface and then allow[] the Commerce SDK to

11   handle certain remaining aspect of payment flow, including . . . payment processing . . . ."[76]

12       As Przybylek explained, however, the roll-out of Commerce SDK that ATMMS was a

13   part of was "a beta program" designed for Elavon "to be able to gain feedback before [it]

14   launched."[77]  "The beta program never promised" EMV readiness by the liability-shift deadline,

15   Przybylek explained.[78]  "Our product was never striving to be ready for the EMV deadline.

16

17

18   [74] Deposition of Eric Przybylek (ECF No. 154) at 21:18–24, 23:10–15.

     [75] Exhibit 39 at PLTF000124.

19   [76] *Id*.

20   [77] Przybylek depo. (ECF No. 154) at 21–22.  *See also* Brooks Carmichael trial testimony, ECF
     No. 136 at 112 ("I think there were a lot of moving targets going on, especially around
21   Commerce SDK, and it was a beta.  It was a beta program that ATMMS was going to test out
     with Elavon."); *id*. at 143:20–21, 148:1–7; ECF No. 140 at 189–190 (wherein ATMMS's
22   Michael Poggi testified that he knew that "in order to utilize Commerce SDK as an early adopter,
     it would be through a beta phase and a beta agreement, none of which were ready" in the
23   summer of 2015; "SDK had to be developed for me to move forward").

     [78] Przybylek depo. (ECF No. 154) at 24:1–11.

There were other options that companies could have if they felt that they had the need to be ready by that deadline to integrate EMV into their system."[79]

Elavon's Lisa Brooks Carmichael also testified that ATMMS knew that Commerce SDK was not going to be ready by the deadline because "SDK wasn't created to be ready by the EMV liability shift day.  It was being created and developed to be the EMV solution for the future. And so they were doing a lot of – this was real software development going on with Commerce SDK.  It was brand-new and a brand-new way of integrating into" Elavon's host software, Converge.[80]  And ATMMS "understood going into Commerce SDK that it didn't have the things that it needed."[81]  Indeed, ATMMS's Michael Poggi knew "that new additional development" of the beta version of Commerce SDK "was required should [ATMMS] desire to continue to use Converge with EMV functionality."[82]  Thus, although ATMMS proved that Elavon promised EMV readiness by the liability-shift deadline, ATMMS has not shown that the Commerce SDK product that Elavon gave to ATMMS was the product that was supposed to do that and that it was a "defective product" because it didn't.[83]  So I cannot find that the record establishes that Elavon was the manufacturer, distributor, or supplier of a defective product such that the

---

[79] *Id.*

[80] ECF No. 136 at 103, 128–29 (Brooks Carmichael testimony).

[81] *Id.* at 139 (Brooks Carmichael testimony); ECF No. 140 at 196–96 (Poggi testimony acknowledging that the problem became that "the specific version of the Elavon software product that [he] hoped to use would not be available" until after the liability-shift date).

[82] ECF No. 140 at 192–193; Exhibit 95 at ELA000221 (invitation for a call regarding Commerce SDK that includes an agenda item entitled "Understanding of current and future integration points with Converge and Commerce SDK (presented by ISV)—including dev environment and target OS, what are they looking to do with the beta version").

[83] *See also* ECF 136 at 150:8–19 (wherein Brooks Carmichael testified that Elavon never made the claim that Commerce SDK would be the product to achieve EMV compliance by the liability-shift date).

1   punitive-damages caps in NRS 42.005(a) do not apply.  Any award of punitive damages in this

2   case, then, will be capped at $300,000.

3           **3.      An additional punitive-damages proceeding is needed.**

4           While I have concluded that punitive damages can be recovered in this case although

5   only nominal damages were awarded and that any such award will be capped at $300,000, there

6   remain the questions of whether punitive damages should be awarded[84] and, if so, how much.

7                   **a.      The court finds that a punitive-damages award is merited.**

8           I answer the first question in the affirmative.  The Ninth Circuit found that ATMMS

9   proved fraud by clear and convincing evidence.[85]  It determined that Elavon intentionally misled

10  ATMMS to believe "that it would process EMV transactions by October 2015" and did so "to

11  keep ATMMS as a client."[86]  The Nevada Supreme Court has explained that "[p]unitive

12  damages are designed not to compensate the plaintiff for harm suffered but, instead, to punish

13  and deter the defendant's culpable conduct."[87]  A business's intentional misrepresentations for

14  purely selfish purposes that harm a client is culpable conduct that is worthy of being punished

15

16

17

18

---

19  [84] ATMMS says that "the Ninth Circuit recognized that punitive damages are appropriate."  ECF
     No. 181 at 19.  It did not.  The panel found that the reason this court declined to award punitive
20   damages—"that ATMMS had not proved at least one intentional tort—fraud" was error, and it
     noted that "[i]n evaluating the amount of appropriate punitive damages, *if any*, the district court
21   must consider" all legal limits on such an award.  ECF No. 173 at 8 & n.5 (emphasis added).  So
     the threshold question of whether this court should exercise its discretion to award punitive
22   damages remains to be answered.

    [85] *Id*. at 2–3.

23  [86] *Id*. at 2.

    [87] *Bongiovi v. Sullivan*, 138 P.3d 433, 450 (Nev. 2006).

1  and deterred.[88]  So I conclude that an award of some punitive damages for this purpose is

2  merited.

3

4          **b.      *An additional proceeding is required to determine the amount of the
                      punitive-damages award.***

5

6          When it has been determined that punitive damages will be assessed, NRS 42.005(3)

7  provides that "a subsequent proceeding must be conducted before the same trier of fact to

8  determine the amount of such damages to be assessed."[89]  There are various restrictions on this

9  determination and this narrow proceeding.

10         First, as the Ninth Circuit instructed, this court must consider the impact of any

11 constitutional limitations on such an award.[90]  "To assess the constitutionality of a state

12 common-law punitive damages award," the Supreme Court in two seminal cases—*BMW of

13 North America, Inc. v. Gore* and *State Farm Mutual Automobile Insurance Co. v. Campbell*—

14 established "three guideposts": "(1) the degree of reprehensibility of the defendant's misconduct;

15 (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive

16 damages award; and (3) the difference between the punitive damages [to be] awarded . . . and the

17 civil penalties authorized or imposed in comparable cases."[91]

18

19

20 ---

   [88] *See, e.g., Olson v. Mid-Century Ins. Co.*, 575 P.3d 82 (Nev. 2025) (unpublished) (upholding
   punitive-damages award for unfair business practices).

21 [89] Nev. Rev. Stat. § 42.005(3).

22 [90] ECF No. 173 at n.5.

23 [91] *Arizona v. ASARCO LLC*, 773 F.3d 1050, 1054 (9th Cir. 2014) (quoting *State Farm Mut. Auto.
   Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003), and citing *BMW of N. Am., Inc. v. Gore*, 517
   U.S. 559, 575 (1996)).

Nevada follows the federal standard and the *Gore–State Farm* guideposts for assessing punitive damages.[92]  "The degree of reprehensibility should reflect 'the enormity of the defendant's offense.'  For example, 'trickery and deceit are more reprehensible than negligence.'"[93]  The Nevada Supreme Court has also found "the economic nature of the harm and the sophistication of the parties" to be mitigating factors.[94]  Importantly, however, the damages-disparity factor is not relevant when there has been no award of compensatory damages.  As the Ninth Circuit explained in *Arizona v. ASARCO LLC*, "[w]hen only nominal damages are awarded, application of a *Gore* ratio analysis is not appropriate."[95]  "Because nominal damages measure neither damage nor severity of conduct, it is not appropriate to examine the ratio of a nominal damages award to a punitive damages award."[96]

So the parties are directed to submit briefing on the narrow topic of the proper amount of punitive damages to be awarded in this case, applying Nevada's punitive-damages jurisprudence and the first and third *Gore–State Farm* factors to the record in this case.  Because the ratio factor does not apply in this nominal-damages case, no new evidence of actual or compensatory damages may be submitted.  All references to testimony or evidence must be accompanied by pinpoint citations to the trial record, my prior factual findings, or the Ninth Circuit panel's

---

[92] *Bongiovi*, 138 P.3d at 452 (holding that "the proper standard for reviewing excessiveness of a punitive damages award in Nevada is the federal standard's three guideposts").

[93] *UnitedHealthCare Ins. Co. v. Fremont Emergency Servs. (Mandavia), Ltd*, 570 P.3d 107, 126 (Nev. June 12, 2025), cert. denied sub nom. *Unitedhealthcare Co. v. Fremont Emergency*, 2025 WL 3620468 (U.S. Dec. 15, 2025) (quoting *Gore*, 517 U.S. at 575–76).

[94] *Id*. at 127.

[95] *ASARCO LLC*, 773 F.3d at 1058.

[96] *Id*. (upholding a $300,000 punitive-damages award on $1 nominal damages); *accord UnitedHealthCare Ins. Co.*, 570 P.3d at 126 ("A higher ratio may be justified in cases where it is difficult to determine the monetary value of an injury.").

memorandum disposition.  This additional briefing is not the proper vehicle to seek reconsideration of any portion of this Order on Remand; it is merely the opportunity to argue the proper amount of punitive damages to be awarded (from $1–$300,000) based on the findings and conclusions in this order and recognizing that this court will apply the $300,000 cap in NRS 42.005(1)(b) and the relevant *Gore–State Farm* constitutional limitations.

### Conclusion

IT IS THEREFORE ORDERED that Plaintiff JB Carter Enterprises, LLC dba ATM Merchant Systems has proven its claim for intentional-interference with existing contracts, for which it is entitled to a nominal-damages award of $1.

IT IS FURTHER ORDERED that Plaintiff JB Carter Enterprises, LLC dba ATM Merchant Systems is entitled to an award of punitive damages, capped by NRS 42.005(1)(b) and the applicable constitutional limitations described in *BMW of North America, Inc. v. Gore* and *State Farm Mutual Automobile Insurance Co. v. Campbell*.

IT IS FURTHER ORDERED that Plaintiff JB Carter Enterprises, LLC dba ATM Merchant Systems has until February 9, 2026, to file its "Motion for Punitive Damages in Bench Trial"; Defendant Elavon, Inc. will have 30 days after that filing to file a response to that motion; and ATMMS will then have 15 days to file a reply brief.  The motion and response may not exceed 20 pages; the reply may not exceed 10 pages.  The court will reserve the entry of an amended judgment until after the conclusion of the punitive-damages proceeding.

The Clerk of Court is directed to REMOVE THE GAVEL from ECF No. 181.

_____
U.S. District Judge Jennifer A. Dorsey
January 9, 2026