**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

JB Carter Enterprises, LLC dba ATM Merchant Systems,

Plaintiff

v.

Elavon, Inc.,

Defendant

Case No.: 2:18-cv-00394-JAD-NJK

**Order re: Punitive Damages**

[ECF No. 188]

After a bench trial, two Ninth Circuit appeals, and robust motion practice, just one question remains in this business-litigation case: *what amount of punitive damages should be assessed against Elavon, Inc. for its fraud against JB Carter Enterprises, LLC dba ATM Merchant Systems (ATMMS)?* The answer to that question is informed by Nevada law and federal constitutional limitations, and it is statutorily capped at $300,000 per my prior rulings.[1] Based on those considerations, I assess $275,000 in punitive damages against Elavon and close this case.

**Analysis**

An award of punitive damages in Nevada must be "reasonably necessary and fairly deserved in order to punish the offender and deter others from similar conduct."[2] So the amount of the award must be proportionate "to the degree of blameworthiness and harmfulness inherent in the oppressive, fraudulent, or malicious conduct of the tortfeasor under the circumstances of"

[1] *See* ECF No. 186. The parties are well aware of the history of this case, which is documented in numerous substantive orders and memoranda, *see id*; ECF Nos. 108, 155, 172, 173, so I don't repeat it here.

[2] *Ace Truck & Equip. Rentals, Inc. v. Kahn*, 746 P.2d 132, 136 (Nev. 1987).

the case.[3] A trial court's assessment of a state common-law punitive-damages award is guided by the seminal United States Supreme Court cases of *BMW of North America, Inc. v. Gore* and *State Farm Mutual Automobile Insurance Co. v. Campbell*.[4] These precedents establish "three guideposts": "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive-damages award; and (3) the difference between the punitive damages [to be] awarded . . . and the civil penalties authorized or imposed in comparable cases."[5] Because, as I explained in my prior order,[6] the second, damages-disparity factor does not apply when only nominal damages have been awarded, which is the case here, I consider only the reprehensibility and comparable-award guideposts.

**A. The reprehensibility of Elavon's conduct is moderate.**

The U.S. Supreme Court in *BMW* recognized that the degree of reprehensibility of the defendant's conduct is "[p]erhaps the most important indicium of the reasonableness" of a punitive-damages award.[7] The "reprehensibility guidepost attempts to align the punitive-damages award with the severity of the wrongful act."[8] "The degree of reprehensibility should

---

[3] *Id*. at 137 (cleaned up).

[4] Nevada follows these *BMW–State Farm* guideposts for assessing punitive damages. *See Bongiovi v. Sullivan*, 138 P.3d 433, 452 (Nev. 2006) (holding that "the proper standard for reviewing excessiveness of a punitive-damages award in Nevada is the federal standard's three guideposts") (cleaned up).

[5] *Arizona v. ASARCO LLC*, 773 F.3d 1050, 1054 (9th Cir. 2014) (cleaned up) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003), and citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

[6] *See* ECF No. 186 at 22 (citing *ASARCO*, 773 F.3d at 1058).

[7] *BMW*, 517 U.S. at 575.

[8] *ASARCO*, 773 F.3d at 1056 (citing *Gore*, 517 U.S. at 575–77) (cleaned up).

reflect 'the enormity of the defendant's offense.'"[9] The *BMW* Court sketched out what the Ninth Circuit has referred to as "a 'hierarchy of reprehensibility,' with acts and threats of violence at the top, 'followed by acts taken in reckless disregard for others' health and safety, affirmative acts of trickery and deceit, and finally, acts of omission and mere negligence.'"[10] The Nevada Supreme Court has also found "the economic nature of the harm and the sophistication of the parties" to be mitigating factors.[11]

The facts upon which the Ninth Circuit found that ATMMS had proven its fraud claim against Elavon form the factual basis for the award of punitive damages here[12]:

> The Ninth Circuit found that ATMMS proved fraud by clear and convincing evidence. It determined that Elavon intentionally misled ATMMS to believe "that it would process EMV transactions by October 2015"[13] and did so "to keep ATMMS as a client." The Nevada Supreme Court has explained that "[p]unitive damages are designed not to compensate the plaintiff for harm suffered but, instead, to punish and deter the defendant's culpable conduct." A business's intentional misrepresentations for purely selfish purposes that harm a client [are] culpable conduct that is worthy of being punished and deterred. So I conclude that an award of some punitive damages for this purpose is merited.

---

[9] *UnitedHealthCare Ins. Co. v. Fremont Emergency Servs. (Mandavia), Ltd*, 570 P.3d 107, 126 (Nev. June 12, 2025), cert. denied sub nom. *Unitedhealthcare Ins. Co. v. Fremont Emergency*, 2025 WL 3620468 (U.S. Dec. 15, 2025) (quoting *Gore*, 517 U.S. at 575–76).

[10] *Swinton v. Potomac Corp.*, 270 F.3d 794, 818 (9th Cir. 2001) (quoting *Florez v. Delbovo*, 939 F. Supp. 1341, 1348–49 (N.D. Ill. 1996)).

[11] *UnitedHealthCare*, 570 P.3d at 127.

[12] *See* ECF No. 173 at 3, 8; *accord* ECF No. 186 at 11.

[13] A substantial portion of the facts on which ATMMS bases its argument relates to alleged wrongful conduct regarding EMV PIN debit. *See, e.g.*, ECF No. 188 at 5–8, 10, 12. Elavon's failure to provide EMV PIN debit capabilities by the liability-shift deadline was one of ATMMS's three fraud theories, but that theory did not survive the most recent appeal and was not a basis for the Ninth Circuit's fraud finding. *See* ECF No. 173 at 2, n.1 (wherein the panel explained that the district court had concluded that "ATMMS failed to prove" that theory, and the panel held that "ATMMS forfeited any challenge with respect to" the PIN debit theory). So the PIN debit facts are not an appropriate basis for punitive damages.

In its punitive-damages briefing,[14] ATMMS stresses that Elavon's employees "made numerous false representations" over several years, stringing it along to believe "that it would be ready for the transition to the EMV [technology], which it always knew was vital to ATMMS's casino business," but "[i]t is undisputed [that] Elavon was not fully ready" by the deadline.[15] ATMMS refers to these representations as "broken promises"[16] that Elavon made to its "most-impacted partner," ATMMS.[17] It theorizes that "Elavon's false representations that it would be ready for the transition to the EMV were intentionally made up to keep ATMMS as a customer" "[b]ecause Elavon selfishly did not want to lose ATMMS as a client."[18] ATMMS characterizes Elavon's acts as "selfish misconduct": "Elavon wanted to keep ATMMS as a client, . . . it was fearful ATMMS might leave, and . . . Elavon kept making false representations to induce ATMMS into staying."[19] So "Elavon continued to misrepresent its readiness until mere days

---

[14] ATMMS suggests that this court needs to hold an evidentiary hearing to determine the amount of punitive damages, at which evidence of Elavon's financial condition would be presented. ECF No. 188 at 15; ECF No. 194 at 2, 9. While NRS 42.005(3) requires a "subsequent proceeding," by "the trier of fact," it does not define what that proceeding must look like. Here, the court (which is the trier of fact in this non-jury case) conducted a non-evidentiary hearing followed by two rounds of briefing on punitive-damages issues. *See* ECF Nos. 177, 181, 188. Those separate, post-trial punitive-damages proceedings, combined with the Ninth Circuit's findings and the evidentiary record from the bench trial, were sufficient to permit this "trier of fact [to] make a finding of the amount to be assessed according to the provisions of" NRS 42.005. Nev. Rev. Stat. § 42.005(3). And because I assume without deciding that Elavon is a wholly owned subsidiary of a multi-billion-dollar financial institution, as ATMMS represents, ECF No. 188 at 13, and Elavon does not argue that a punitive-damages judgment of any size will herald its financial devastation, no further hearing or financial-condition evidence is necessary for me to complete this calculation.

[15] ECF No. 188 at 9–10, 13.

[16] *Id*. at 10.

[17] *Id*. at 14 (cleaned up).

[18] *Id*.

[19] *Id*. at 11.

before the liability shift when . . . it was too late for ATMMS to do anything to save its business."[20]

The District of Oregon's recent decision in *Great West Capital, LLC v. Payne*[21] is instructive on just where Elavon's conduct falls in the hierarchy of reprehensibility. In that business-to-business case, Great West brought a fraud claim under Nevada law against a contracted cattle manager, alleging that it had made promises about branding cattle, caring for cattle, and keeping accurate livestock records, but those representations were false and the defendant never intended to perform those promises.[22] The jury returned a verdict for the plaintiff on the fraud claim and awarded nominal damages of $1 plus $1,000,000 in punitive damages.[23] The judge reduced that award to $300,000 based on Nevada's statutory cap on punitive damages on compensatory awards of less than $100,000.[24] He then halved that award under the *BMW–State Farm* factors.

The judge found the case to be "toward the lower end of the spectrum of malevolence found in punitive damages cases."[25] "Defendants are accused only of economic harm that did not implicate the health or safety of anyone, and plaintiffs presented no evidence of their financial vulnerability," he pointed out.[26] While the return of a plaintiff's verdict on the fraud claim reflected "a finding . . . that defendants acted intentionally," he reasoned that it was at most

---

[20] *Id*. at 13.

[21] *Great West Capital, LLC v. Payne*, 2025 WL 2463216 (D. Or. Aug. 27, 2025).

[22] *Payne*, 2025 WL 2463216 at *3.

[23] *Id*. at *5.

[24] *Id*.

[25] *Id*. at *6.

[26] *Id*. (cleaned up).

"some trickery or deceit,' which does not amount to the worst kind of tortious conduct justifying punitive damages."[27] So the court concluded that the conduct, "though fraudulent," did not "justify a substantial punitive-damage award."[28]

Also helpful in the reprehensibility assessment here is *Ace Truck & Equipment Rentals, Inc. v. Kahn*.[29] The buyers of a car-rental business sued the seller for material and false representations about the business's solvency and assets.[30] The jury awarded the buyers nearly $400,000 in compensatory damages, plus double that amount in punitive damages.[31] The Nevada Supreme Court cut the punitive-damage award in half on appeal after finding it "clearly excessive and disproportionate as a matter of law."[32] The court reasoned that "[t]he degree of fault or blame [wa]s not extravagant."[33] "This was a simple business sales transaction"; the buyers "appear[ed] to be business people of normal and expected wisdom and sophistication"; and "[a]lthough the record support[ed] liability for fraud and consequent punitive damages, the conduct of defendants can probably be said to be toward the lower end of the spectrum of malevolence found in punitive damage cases."[34]

Like the fraud in *Great West* and *Ace Truck*, Elavon's hits the lower end of the malevolence spectrum. While the Ninth Circuit found Elavon's conduct to be clearly and convincingly fraudulent, it slots relatively low in the hierarchy of reprehensibility. The *BMW*

---

[27] *Id*. (cleaned up).

[28] *Id*. (cleaned up).

[29] *Ace Truck & Equip. Rentals, Inc.*, 746 P.2d at 137.

[30] *Id*. at 133.

[31] *Id*.

[32] *Id*. at 138.

[33] *Id*. at 137.

[34] *Id*.

Court identified as "aggravating factors associated with particularly reprehensible conduct" such things as "indifference to or reckless disregard for the health and safety of others" or targeting the "financially vulnerable," and it contrasted those with "purely economic" harm.[35] ATMMS was a seasoned business that was not particularly vulnerable. Elavon's conduct did not affect health or safety. ATMMS argues that the harm impacted it uniquely, so this was not a case with a serial violator of Nevada law.[36] And Elavon's acts were more selfish than predatory, as its goal (as ATMMS itself characterizes it) was to avoid losing ATMMS as a customer rather than to intentionally inflict harm on ATMMS. So I cannot conclude that the degree of reprehensibility of Elavon's conduct justifies a sizeable punitive-damages award.

**B. Awards in comparable cases support a moderate award.**

The other *BMW* guidepost for this court to evaluate here is "the difference between this remedy and the civil penalties authorized or imposed in comparable cases."[37] Neither party points to any relevant legislative analogs, so I focus on awards in similar cases for this analysis.

ATMMS offers two Ninth Circuit cases for this purpose. It notes that in *Arizona v. ASARCO, LLC* the "court upheld a $300,000 punitive-damages award on only $1 in nominal damages" and that *California v. Altus Finance* reflects this circuit's "recognition that significant punitive damages can be awarded in cases where only nominal damages are awarded."[38] Aside from this general recognition, *Altus* is no help here because, as ATMMS concedes, the *Altus*

---

[35] *BMW*, 517 U.S. at 576.

[36] *Compare with ASARCO*, 773 F.3d at 1059 (noting as relevant in the punitive-damages analysis that ASARCO was "a serial violator of antidiscrimination laws").

[37] *BMW*, 517 U.S. at 575.

[38] ECF No. 188 at 14–15 (citing *ASARCO*, 773 F.3d at 1058, and *California v. Altus Finance, S.A.*, 540 F.3d 992 (9th Cir. 2008)).

court struck the punitive-damages award in that case completely.[39] And the ASARCO case is too factually distinguishable to offer much guidance. It was a Title VII sexual-harassment case by a mine worker. The en banc Ninth Circuit Court found "significant and compelling evidence that management was aware of, and did little to resolve, lewd, inappropriate, and sexually aggressive behavior directed to [the claimant]; sexually explicit, targeted pictures of [her] on the walls of the bathroom rented specifically for her use; and overly aggressive management and criticism of [her] by supervisors."[40] And though she "complained to management multiple times," nothing was done.[41] Other than the fact that the plaintiff was awarded $1 in nominal damages and that a $300,000 punitive-damages cap applied, ASARCO shares no material characteristics with this business-litigation matter.

More comparable are *Great West*, in which the district court awarded $150,000 on each of two fraud claims for a total of $300,000,[42] and *Ace Truck & Equipment Rentals*, in which punitive damages of $250,000 and $150,000 were assessed against separate defendants.[43] The Sixth Circuit case of *Bonfiglioli USA Inc. v. Midwest Engineered Components, Inc.*, decided earlier this year, is another helpful comparator. In this business-to-business fraud case, the jury found Midwest liable for fraudulently inducing Bonfiglioli to enter into a sales-representative contract for Midwest to serve "as a middleman to facilitate sales of" the industrial machine parts that Bonfiglioli manufactured.[44] The contract contained a Kentucky choice-of-law provision, but

---

[39] *See id*. at 15.

[40] *ASARCO*, 773 F.3d at 1059.

[41] *Id*.

[42] *Great West*, 2025 WL 2463216 at *14.

[43] *Ace Truck & Equip. Rentals*, 746 P.2d at 512.

[44] *Bonfiglioli USA Inc. v. Midwest Engineered Components, Inc.*, __ F.4th __, 2026 WL 2185564, *1 (6th Cir. July 29, 2026).

the law of Minnesota, where Midwest was based, "contains an aggressive anti-waiver provision" that voids such a clause, a feature that Kentucky-based Bonfiglioli was not aware of.[45] When Bonfiglioli later sent Midwest a termination letter under the terms of their contract, Midwest waited three months to respond and then threatened to sue it under various provisions of Minnesota law unless Bonfiglioli paid Midwest $165,000 within two weeks.[46] The timing of the demand left Bonfiglioli unable to comply with Minnesota law, so it sued, theorizing that Midwest fraudulently induced it to enter into the contract by falsely representing that it would be bound by Kentucky law.[47] The jury agreed and awarded Bonfiglioli $1 in nominal damages plus $280,000 in punitive damages.[48] The Sixth Circuit upheld that award on appeal.[49] These cases demonstrate that punitive-damage awards in the range of $150,000 to $300,000 are common, reasonable, and constitutional in nominal-damage cases.

**C. Under the *BMW–State Farm* factors, a moderate award of $275,000 in punitive damages is merited against Elavon.**

Considering the moderate reprehensibility of Elavon's conduct and the amount of awards in comparable business-litigation cases, I find that ATMMS is entitled to an award of $275,000 in punitive damages from Elavon. Although ATMMS argues that a maximum award is required because of the degree of harm it suffered: ATMMS's revenue was cut by a factor of 10 "[a]fter Elavon's documented fraud,"[50] this court found that ATMMS had not proven such compensatory

---

[45] *Id.*

[46] *Id.* at *2.

[47] *Id.*

[48] *Id.* at *1.

[49] *Id.* at *13.

[50] ECF No. 188 at 14.

damages, and the Ninth Circuit upheld that conclusion.[51] Plus, punitive damages are not designed to compensate a plaintiff but rather to punish the defendant,[52] so a focus on ATMMS's claimed harm would be improper under Nevada law. I thus conclude that an award of $275,000, in light of all of the relevant circumstances of this case,[53] is the amount reasonably necessary and fairly deserved in order to punish Elavon and deter others from similar conduct.

**Conclusion**

IT IS THEREFORE ORDERED that an award of punitive damages is assessed against Elavon, Inc. and in favor of Plaintiff JB Carter Enterprises, LLC dba ATM Merchant Systems in the amount of $275,000.

The Clerk of Court is directed to ENTER an AMENDED JUDGMENT adding this award and CLOSE THIS CASE

U.S. District Judge Jennifer A. Dorsey
September 30, 2026

[51] ECF No. 173 at 7 ("[T]he district court concluded that ATMMS's evidence regarding the amount of its actual damages was speculation, from which the district court could not make a reasonably accurate damages calculation, and awarded nominal damages of one dollar. That was not clear error.") (citations omitted).

[52] *See Olson v. Mid-Century Ins. Co.*, 575 P.3d 82 (Nev. 2025) (Pickering, J., concurring in part and dissenting in part) ("Punitive damages . . . do not compensate a plaintiff; rather, they punish the defendant."); *Ace Truck & Equip. Rentals, Inc.*, 746 P.2d at 134 ("Because the purpose of punitive damages is to punish and deter, the courts in examining these awards should focus on the character of defendant's conduct rather than on the injury suffered by the plaintiff.").

[53] I would calculate $275,000 to be the amount "reasonably necessary and fairly deserved in order to punish the offender and deter others from similar conduct" regardless of whether punitive damages were capped at $300,000 in this case. *Ace Truck & Equip. Rentals, Inc.*, 746 P.2d at 136.